

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § | No. 08-18-00074-CV |
| --- | --- | --- |
| IN THE MATTER OF | § | Appeal from the |
| TROY S. POE TRUST. | § | Probate Court No. 1 |
|  | § | of El Paso County, Texas |
|  | § | (TC# 2016-CPR00308) |

## **O P I N I O N**

Before us is a hotly contested trust-modification proceeding with the underlying question of whether the parties have a constitutional jury-trial right. This case was brought in an El Paso statutory probate court; from there, it was appealed to this Court, then to the Texas Supreme Court, and remanded back to this Court. The Texas Supreme Court held that there is no statutory right to a jury trial in a Texas Trust Code § 112.054 trust-modification proceeding and tasked this Court with determining the novel issue of whether Texas Constitution Article V, § 10 (the Judiciary Article) guarantees the parties a jury-trial right in such a proceeding. We conclude that there is no Judiciary Article jury-trial right in the present case and review the probate court's judgment modifying the trust following a bench trial. Based on the reasoning below, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

As the Texas Supreme Court laid out the detailed facts in its remand opinion, we provide only a general factual and procedural overview below. *Matter of Troy S. Poe Tr.*, 646 S.W.3d 771, 773-76 (Tex. 2022).

### A. The Troy S. Poe Trust and trustee disagreements following Dick's death

Richard "Dick" Poe (Dick) created the "Troy S. Poe Trust" (the Trust) in 2007 to provide for the "health, education, maintenance and support" of his son, Troy, who has cerebral palsy and requires constant care. *Id.* at 773. The trustees appointed to administer the Trust were Dick; Dick's only other child, Richard Poe (Richard); and Dick's longtime accountant, Anthony Bock (Bock). *Id.*

The Trust is a party to a long-term "Care Agreement," setting forth the terms under which Troy's caregiver, Angel Reyes (Reyes), would care for Troy and receive compensation therefor. *Id.* Under the Care Agreement, Reyes and his family live with Troy in a home Dick built and provide Troy full-time care. *Id.* In addition to meeting Troy's daily needs, Reyes's duties include ensuring that Troy enjoys "a wholesome and healthy home environment," "companionship," and "social interaction and entertainment to the extent possible." *Id.* In exchange, Reyes is paid a salary and reimbursed for "reasonable out-of-pocket expenses for Troy's care." *Id.*

While the Trust provided that the three trustees were to act "jointly," prior to his death, Dick unilaterally administered the Trust without objection from Richard or Bock. *Id.* After Dick died in 2015, Bock unilaterally administered the Trust, making distributions he believed mirrored Dick's past practices. *Id.* at 773-74. Richard eventually objected and demanded that Bock consult with him in administering the Trust. *Id.* at 774. Bock began consulting with Richard, but the two had a "fraught relationship," which in part stemmed from other disagreements over financial

2

matters unrelated to the Trust, some of which resulted in litigation.[1] Richard and Bock disagreed on various trust administration issues, including making the types of generous Trust distributions Dick had routinely made. *Id*. at 774. In addition, Richard accused Bock of "stealing" from the Trust and objected to distributions that Richard argued benefitted Reyes and his family rather than Troy. *Id.*

### B. Bock's trust-modification petition and the probate court's ruling

Unable to reach unanimous decisions, Bock filed a petition in the probate court to modify the Trust under Trust Code § 112.054. *Id.* at 774. Bock asked the court to add a third trustee, remove the unanimity requirement, and specify the relevant considerations governing the Trust's distributions. Troy, acting through his court-appointed guardian ad litem and attorney ad litem, supported Bock's modification request. Richard opposed the modification and counterclaimed against Bock for breach of trust. *Id.* He demanded a jury trial on all triable issues of fact on Bock's petition to modify and on the counterclaim. *Id.*

The probate court denied Richard's jury demand on the modification petition and conducted a two-day bench trial. *Id*. at 774–75. At trial, several witnesses (including Bock) testified to Dick's purpose in establishing the trust, which they believed was to ensure that Troy maintained a happy and healthy lifestyle commensurate with Dick's financial status.

Following trial, the probate court found that because of "changed circumstances" since Dick's death, "the purposes of the Trust have become impossible to fulfill, and modification will further the Trust purposes." *Id.* at 775. The court entered an Order Modifying Trust effecting several changes to the Trust's terms in accordance with Bock's requests. *Id.* at 775. The probate

---

[1] The litigation included various lawsuits Richard filed against Bock after Dick's death regarding Bock's management of another trust Dick created, Bock's management of one of Dick's companies, and Bock's role as co-executor of Dick's estate.

3

court severed the remaining claims and set Richard's breach-of-trust counterclaim for a jury trial. *Id.* The modification order became a final judgment. *Id.*

### C. Appellate court rulings

Richard appealed the trial court's modification order, arguing that (1) he was erroneously denied a jury trial, and (2) the modifications contravened Dick's intent. Opining that the Trust Code provided a statutory jury-trial right in a trust-modification proceeding, this Court reversed the trial court's judgment and remanded the matter for a new trial before a jury. *Matter of Troy S. Poe Tr.*, 591 S.W.3d 168, 178 (Tex. App.—El Paso 2019), rev'd, 646 S.W.3d 771 (Tex. 2022).

On appeal, the Texas Supreme Court disagreed that the Trust Code conferred a statutory jury-trial right but remanded the case to this Court to address the novel issue of whether parties to such a trust-modification proceeding have a constitutional jury-trial right. *Matter of Troy S. Poe Tr.*, 646 S.W.3d at 777–78, 780–81.

## JURY-TRIAL RIGHTS UNDER THE TEXAS CONSTITUTION

As the Texas Supreme Court recognized in *Poe*, the 1876 Texas Constitution—our current Constitution along with multiple amendments—contains two provisions speaking to a jury-trial right in civil cases. *Id.* at 778 (citing *Barshop v. Medina Cnty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 636 (Tex. 1996).

### A. The Bill of Rights

First, the Bill of Rights states the "right of trial by jury shall remain inviolate." TEX. CONST. art. I, § 15. This provision maintains a jury-trial right for the type of actions tried by jury when the Constitution was adopted and thus "only applies if, in 1876, a jury would have been allowed to try the action or an analogous action." *Matter of Troy S. Poe Tr.*, 646 S.W.3d at 778 (citing *Barshop*, 925 S.W.2d at 636); *see also Cockrill v. Cox*, 65 Tex. 669, 674 (1886) (reinforcing the same). And

4

in 1876, there was no right to a jury trial in equitable actions; consequently, the Bill of Rights did "not alter the common law tradition eschewing juries in equity." *Matter of Troy S. Poe Tr.*, 646 S.W.3d at 778 (quoting *Casa El Sol-Acapulco, S.A. v. Fontenot*, 919 S.W.2d 709, 715 (Tex. App.—Houston [14th Dist.] 1996, writ dism'd by agr.)). Insofar as trust-deviation proceedings existed in 1876, they were considered equitable in nature, such that there would have been no jury-trial right at that time. *See generally Matter of Troy S. Poe Tr.*, 646 S.W.3d at 778; *see also Matter of Troy S. Poe Tr.*, 646 S.W.3d at 782 (Busby, J. concurring) (discussing the equitable nature of the proceedings). Therefore, as the parties concede, there is no jury-trial right in a trust-modification proceeding under the Bill of Rights.

## B. The Judiciary Article

Second, the "Judiciary Article" states:

> In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury; but no jury shall be empaneled in any civil case unless demanded by a party to the case, and a jury fee be paid by the party demanding a jury, for such sum, and with such exceptions as may be prescribed by the Legislature.

TEX. CONST. art. V, § 10.

In contrast with the Bill of Rights, this provision expanded the jury-trial right to all "causes" in both law and equity, regardless of whether a jury trial was available for the same in 1876. *Matter of Troy S. Poe Tr.*, 646 S.W.3d at 778 (citing *Texas Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 527 (Tex. 1995)). However, there are differences in opinion regarding how the term "causes" in this provision should be defined. *Id.* at 778–81.

Below, we review Texas court opinions discussing the Judiciary Article's jury-trial right over time to arrive at a workable framework for determining what constitutes a Judiciary Article

5

"cause." Then we consider whether a statutory trust-modification proceeding is such a cause.[2]

## THE PARTIES' DIFFERING APPROACHES TO DEFINING A CAUSE

Richard argues that "cause" includes virtually any "contested" case with a factual dispute suitable for a jury to resolve. And he contends that Bock's modification petition raises at least two factual disputes suitable for jury review: whether the trust purposes have become impossible to fulfill and whether changed circumstances unforeseen to the settlor warrant a modification. Richard then advocates for what appears to be a two-step process. The jury would resolve the factual disputes while the probate court would ultimately determine, as a matter of equity, whether and how to modify the trust terms depending on its factual findings.

Bock, on the other hand, argues that "cause" should include only "ordinary" causes of action, also referred to as "personal" actions, in which a plaintiff is seeking a personal judgment against a defendant based on the defendant's breach of a duty or other wrongdoing. He posits that a plaintiff must be asserting some "personal right" for which he may obtain a remedy or enforceable judgment against the defendant. And he argues that a trust-modification proceeding lacks the attributes of an ordinary cause of action—it is not brought by a plaintiff seeking a judgment against a defendant, but instead is brought in the interest of the beneficiary and will not

---

[2] We do not address the Judiciary Article language "in the District Courts" because the Texas Legislature has given district courts and statutory probate courts, such as the one in which this proceeding was brought, concurrent jurisdiction in trust-modification proceedings. TEX. EST. CODE ANN. § 32.007(3) (providing that a statutory probate court and a district court have concurrent jurisdiction in an "action involving an inter vivos trust, testimony trust or charitable trust"); TEX. PROP. CODE ANN. § 115.001(a), (d) (except for jurisdiction conferred by law on a statutory probate court, a district court has "original and exclusive jurisdiction over . . . all proceedings concerning trusts"); *see also Lee v. Lee*, 528 S.W.3d 201, 212–13 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (recognizing that a statutory probate court and a district court have concurrent jurisdiction over trust matters). And when a statutory probate court and a district court have concurrent jurisdiction, the "practice, procedure, rules of evidence, issuance of process and writs, juries, including the number of jurors . . . and all other matters pertaining to the conduct of trials and hearings in the statutory probate courts . . . are governed by the laws and rules pertaining to district courts." TEX. GOV'T CODE ANN. § 25.0027. Accordingly, if a party were entitled to a jury trial in the district court in a trust-modification proceeding, he would also be entitled to one in the statutory probate court.

result in an enforceable judgment against any of the interested parties.

We conclude that Bock's approach is the correct one, as it more closely aligns with the 1876 Constitution drafters' intent in formulating the Judiciary Article's jury-trial right and best comports with Texas jurisprudence over time.

### A CAUSE DOES NOT INCLUDE EVERY CONTESTED LEGAL PROCEEDING

We first address why Richard's position that the Judiciary Article "cause" encompasses every legal proceeding involving a contested factual question is not a tenable one.

#### A. Rules of construction

"In construing the [Texas] Constitution, as in construing statutes, the fundamental guiding rule is to give effect to the intent of the makers and adopters of the provision in question." *Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 842 (Tex. 2009) (citing *Cox v. Robison*, 150 S.W. 1149, 1151 (Tex. 1912)). We thus strive to "give effect to the plain meaning of the text as it was understood by those who ratified it." *In re Abbott*, 628 S.W.3d 288, 293 (Tex. 2021) (citing *Sears v. Bayoud*, 786 S.W.2d 248, 251 (Tex. 1990); *Degan v. Bd. of Trustees of Dallas Police & Fire Pension Sys.*, 594 S.W.3d 309, 313 (Tex. 2020). In construing the Constitution, it is "presumed that the language in which it is written was carefully selected and made to express the will of the people, and that in adopting it [the drafters] intended to give effect to every one of its provisions." *Mellinger v. City of Houston*, 3 S.W. 249, 252 (Tex. 1887); *see also Harris Cnty. Hosp. Dist.*, 283 S.W.3d at 842 (citing *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 148 (Tex. 1995)) (recognizing that a court must look to the plain language of the text, "presume the language of the Constitution was carefully selected, and [] interpret words as they are generally understood").

While we construe the meaning of Constitutional provisions by relying "heavily on the literal text[,]" we may also "consider such matters as the history of the legislation . . . the conditions and spirit of the times, the prevailing sentiments of the people, the evils intended to be remedied, and the good to be accomplished." *Harris Cnty. Hosp. Dist.*, 283 S.W.3d at 842 (internal quotation marks omitted). And in determining how to construe undefined terms in the Constitution, it is appropriate to consider definitions from other sources in use at the time of its adoption. *See State v. Credit Bureau of Laredo, Inc.*, 530 S.W.2d 288, 292 (Tex. 1975) (considering dictionary definitions of the term "cause" that were in use at the time the Constitution was drafted); *see generally Jaster v. Comet II Const., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014) (recognizing that a court may look to a wide variety of sources, including dictionary definitions, treatises and commentaries in use at the time the statute was adopted).

## B. Evolving Texas constitutional jury-trial rights

Earlier versions of the Constitution containing far broader jury-trial rights are significant to our understanding of the drafters' intent in enacting the 1876 Texas Constitution Judiciary Article's jury-trial provision. The 1845 Constitution provided parties a jury-trial right in "all causes in equity" in addition to the jury-trial right in the Bill of Rights. TEX. CONST. art. IV, § 16 (1845) ("In the trial of all causes in equity in the district court, the plaintiff or defendant shall, upon application made in open court, have the right of trial by jury, to be governed by the rules and regulations prescribed in trials at law.").[3] The 1846 Constitution added a third jury-trial right—one in all "causes arising out of a contract" when the matter in controversy exceeded ten dollars. *Id.* at art. IV, § 18.

---

[3] Article IV: Judicial Department - Constitution of Texas (1845) - Tarlton Law Library at Tarlton Law Library (utexas.edu); https://tarlton.law.utexas.edu/c.php?g=787754&p=5639721.

In the 1869 Constitution, the drafters retained these three jury trial rights and added a fourth: "In all cases of law or equity, when the matter in controversy shall be valued at or exceed ten dollars, the right of trial by jury shall be preserved[.]"[4] TEX. CONST. art. V, § 16 (1869). In 1870, the Texas Supreme Court interpreted this broad 1869 constitutional language to mean that litigants were entitled to a jury trial upon request in all *cases* pending in a Texas court, whether in law or equity, when the matter in controversy exceeded ten dollars and "where an issue of fact is joined between parties[.]"*Davis v. Davis*, 34 Tex. 15, 24 (1870). The *Davis* Court held that a jury was to decide all questions of fact, while questions of law remained within the trial court's purview. *Id.* However, the 1876 Constitution removed all three jury-trial rights that were in the 1869 Constitution, save the one in the Bill of Rights, and added the narrower Judiciary Article language that remains today, providing a jury-trial right to plaintiffs and defendants in "all causes in the District Courts." *See Credit Bureau*, 530 S.W.2d at 292 (explaining that earlier constitutional provisions extended a jury-trial right to "all cases of law or equity," but the present version provides for a jury-trial right in the "trial of all causes . . .").

In interpreting constitutional language, we can, at least in part, infer the drafters' intent by looking at successive versions of the same document. Thus, when the drafters of a subsequent Constitution retain a provision in an earlier Constitution, it is "presumed to have been with a purpose not to change the law, and the use of the same language is presumed to have been with the same intent." *Koy v. Schneider*, 221 S.W. 880, 918 (Tex. 1920) (citing THOMAS COOLEY, CONSTITUTIONAL LIMITATIONS 75 (Little, Brown & Co. eds., 6th ed. 1890)); *see also Taylor v. Boyd*, 63 Tex. 533, 541 (1885) (recognizing that it is "presumed, when similar language was found

---

[4] *See* Article V: Judicial Department - Constitution of Texas (1869) - Tarlton Law Library at Tarlton Law Library (utexas.edu) https://tarlton.law.utexas.edu/c.php?g=812156&p=5795231.

in former constitutions, that it was intended to use the same language in the present constitution in the sense which had been given to it in the courts of the state"). Accordingly, if the drafters of the 1876 Constitution had left in the jury-trial right provision that the *Davis* Court interpreted to give parties a jury-trial right in virtually any contested proceeding, we would be bound by that interpretation and would agree that there is a constitutional jury-trial right in virtually any case involving a factual issue.

However, by eliminating the broad language in the 1869 Constitution and adding narrower language in the 1876 Constitution, we infer that the drafters intended a different result. *See generally Jessee v. De Shong*, 105 S.W. 1011, 1014 (Tex. Civ. App. 1907, no writ) (citing *Wills v. Russell*, 100 U.S. 621 (1879)) (recognizing that in construing a change to a legislative act, the "omissions of material words plainly indicate an intent to change the law"); *see also Cook v. State*, 824 S.W.2d 634, 643 (Tex. App.—Dallas 1991, pet. ref'd) (in enacting statutory amendment, "the legislature is presumed to have changed the law, and the court should adopt a construction that gives effect to the intended change, rather than one that renders the amendment useless"); *see generally Indep. Life Ins. Co. of Am. v. Work*, 77 S.W.2d 1036 (Tex. 1934) ("The rule is elementary that we must give some effect to changes in the words of legislative acts, and must also construe their words, so as to accomplish the legislative intent."). Accordingly, the *Davis* Court's broad statements regarding the right to a jury trial in all "cases" in which a factual issue exists under the 1869 Constitution are of little, if any, value in determining the Judiciary Article jury-trial right in the 1876 Constitution.

### C. The court in *Poe* rejected an overly broad interpretation of the jury-trial right

Despite the changes to the 1876 Constitution, Richard correctly points out that some cases at the turn of the 20th Century continued to use broad language when describing the constitutional

10

jury-trial right, asserting, whether in dicta or otherwise, that it gave parties a jury-trial right in virtually any proceeding in which there was a contested issue or a disputed "matter of fact." *See, e.g.*, *Tolle v. Tolle*, 104 S.W. 1049, 1050 (Tex. 1907) (speaking to the right to have a jury decide "[a]ny question civil or criminal contested before a court of justice," and that "[i]t is not a question of the nature of the contest, but, merely, is there a matter of fact for a jury to determine?"); *San Jacinto Oil Co. v. Culberson*, 101 S.W. 197, 198 (Tex. 1907) (holding that a party is constitutionally entitled to a trial by jury on the contested issues of fact in "all causes . . . without regard to any distinction between law and equity" upon demand and payment of a fee). And we acknowledge that at least two of our sister courts in more recent times have used similarly broad language. *See, e.g.*, *Casa El Sol-Acapulco, S.A.*, 919 S.W.2d at 715–16 (the "right to a jury trial extends to disputed issues of fact in equitable as well as legal proceedings"); *Jeter v. Associated Rack Corp.*, 607 S.W.2d 272, 277–78 (Tex. App.—Texarkana 1980, writ ref'd n.r.e.) ("The law in Texas is that the right to a jury trial extends to disputed issues of fact in equitable as well as legal proceedings.").

In part, this broad interpretation of the jury-trial right stemmed from how the term "cause" was said to be defined at the time the 1876 Constitution was drafted. As the Texas Supreme Court in *Poe* recognized, some of its earlier opinions observed that at the time, "action," "suit," and "cause" were treated as "convertible terms" and were defined to mean "any legal process which a party institutes to obtain his demand or by which he seeks his right." *Matter of Troy S. Poe Tr.*, 646 S.W.3d at 779 (quoting *Credit Bureau*, 530 S.W.2d at 292). In *Credit Bureau*, the Court looked to the 1951 version of Black's Law Dictionary, which defined a "cause" as "a suit, litigation, or action. Any question, civil or criminal, litigated or contested before a court of justice." 530 S.W.2d at 292 (quoting Black's Law Dictionary (4th ed. 1951)). The *Credit Bureau* Court also cited the

11

United States Supreme Court's opinion in *Ex parte Milligan*, in which the Court quoted from the Webster Dictionary in effect in 1866, which defined the term "cause" as "[a] suit or action in court; any legal process which a party institutes to obtain his demand, or by which he seeks his right, or supposed right," and further stated that "[i]n any legal sense, action, suit, and cause, are convertible terms." 71 U.S. 2, 112 (1866). It further relied on the 1907 *Tolle* opinion using a similar definition from Bouvier's Law Dictionary defining the term "cause" to mean "[a]suit or action; any question civil or criminal contested before a court of justice." *Tolle*, 104 S.W. at 1050.

Yet, as the *Poe* Court recognized, any such broad interpretation of the Judiciary Article's jury-trial right as applying to virtually any contested proceeding is contrary to the manner in which it has historically interpreted and applied that right. In 1908, one year after the *Tolle* Court interpreted "cause" in the Judiciary Article broadly, the *Pittman* Court distinguished civil proceedings "other than actions" to which the Judiciary Article jury-trial right did not attach. *Pittman*, 112 S.W. at 104. In fact, the Texas Supreme Court has long held that not all "adversary" proceedings qualify as a "cause" under the Judiciary Article. *See Matter of Troy S. Poe Tr.*, 646 S.W.3d at 779 (recognizing that an adversarial component to a case does not necessarily make it a "cause" for purposes of Article V); *see also Oncor Elec. Delivery Co., LLC v. Chaparral Energy, LLC*, 546 S.W.3d 133, 144 (Tex. 2018) (explaining that the constitutional right to a jury trial does not attach in certain types of adversary proceedings); *Credit Bureau*, 530 S.W.2d at 293 ("not all adversary proceedings qualify as a 'cause' under the Judiciary Article"); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 450 (Tex. 1993) (recognizing that "in certain types of adversary proceedings the constitutional right to a jury trial does not attach").

Despite the sporadic judicial opinions broadly interpreting the term "cause" over time, the framers of the Constitution could not have intended the term "cause" to embrace every contested

proceeding; even in 1876, it was generally recognized that "there were some cases in which trial by jury was not accorded in the district courts."[5] Whitney R. Harris, *Jury Trial in Civil Cases—A Problem in Constitutional Interpretation*, 7 Sw. L.J. 1, 17 n.65 (1953). And to this day, the Texas Supreme Court has continued to hold that a jury-trial right does not exist under the Texas Constitution in a variety of proceedings, including, but not limited to, "civil contempt proceedings, election contests, habeas corpus proceedings for custody of minor children, suits for the removal of a sheriff, and appeals in administrative proceedings." *Matter of Troy S. Poe Tr.*, 646 S.W.3d at 779 (citing *Credit Bureau*, 530 S.W.2d at 293). Yet there is no doubt many of these cases will involve factual disputes or contested issues. For example, in a civil contempt proceeding, a court may determine whether an alleged contemnor is, in fact, in contempt. And in a removal proceeding, a court may determine whether a public official committed any wrongdoing that requires her removal. Nonetheless, in such cases, the Court recognizes that any disputed factual issues are to be determined by a judge rather than a jury.[6]

---

[5] Professor Harris explains that when the 1876 Constitution was adopted, "trial by jury generally [was] not accorded[] [in] mandamus, habeas corpus, enforcement of health regulations, administration of estates of decedents, probate and contest of wills, guardianship, insolvency, proceedings for assessments for public improvements, condemnation proceedings, proceedings against public officers, enforcement of bonds and recognizances, revocation or cancellation of licenses and permits, disbarment and other proceedings against attorneys, seizures, penalties, forfeitures, and miscellaneous other proceedings." Whitney R. Harris, *Jury Trial in Civil Cases—A Problem in Constitutional Interpretation,* 7 Sw. L.J. 1, 17 n.65 (1953) (citing 50 C.J.S., Juries, p. 762 et seq.).

[6] To Justice Busby's point in *Poe*, we recognize that in some cases—particularly in those of an equitable nature—there may be some factual issues that should be resolved by a jury, while other issues should be resolved by a judge, such as legal issues and questions of "equitable discretion" in determining the nature of relief to be afforded. *Matter of Troy S. Poe Tr.*, 646 S.W.3d at 785 (Busby, J. concurring) (citing *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 741 (Tex. 2018)). In other words, a trial court may in some instances divide the "labor" between itself and the jury in a two-step process by which a jury first resolves any factual issues then a court makes any legal or equitable decisions. However, unless the proceeding is one for which there is a jury-trial right in the first instance—either as granted by the Constitution or by statute—any such process will not apply, and instead, the trial court judge will be responsible for deciding both factual and legal disputes without assistance from a jury.

Accordingly, we reject Richard's argument that the Judiciary Article gives parties the right to a jury trial in all proceedings in which there is a contested factual issue.

## A WORKABLE TEST FOR DETERMINING WHEN A PROCEEDING IS A "CAUSE"

Understanding that not all contested proceedings are causes, we next examine what framework is best for determining when a proceeding is a Judiciary Article cause. The Texas Supreme Court has historically recognized a distinction between "causes" for which the jury-trial right exists and "special proceedings" for which there is no such right. In fact, the Court framed the issue for us to consider as whether a "Section 112.054 judicial trust-modification proceeding is not a 'cause' within the meaning of Article V, Section 10 of the Texas Constitution but, rather, a 'special proceeding' falling outside its purview." *Matter of Troy S. Poe Tr.*, 646 S.W.3d at 772–73.

### A. Rejecting a "special circumstances" test

In the past, some courts have framed the test for determining whether a Judiciary Article jury-trial right exists in terms of whether there is some "special reason" or "special circumstances" rendering a jury trial "unsuitable" in a particular proceeding. *See Credit Bureau*. 530 S.W.2d at 293; *see also Matter of Troy S. Poe Tr.*, 646 S.W.3d at 781 (Busby, J. concurring) (finding that Texas courts have denied the right to a jury trial under the Judiciary Article by creating "*ad hoc*, 'case-by-case' exceptions that deem juries 'unsuitable' based on 'isolated' '[s]pecial circumstances' rather than any coherent analytical framework"). In *Credit Bureau,* the Texas Supreme Court listed several cases in which it had previously held there was no jury-trial right and posited that in each of those instances, there was "some special reason that a jury [was] unsuitable"

in that proceeding.[7] *Credit Bureau*. 530 S.W.2d at 293.

Upon closer examination of the cited cases, the Court has never relied on a "special circumstances" test in denying a Judiciary Article jury-trial right in any given proceeding; instead, the Court has determined that no jury-trial right existed in a the particular proceeding because the proceeding could not be considered a "cause" within the meaning of the Judiciary Article and was instead was a "special proceeding" outside its scope. *See, e.g.*, *Texas Liquor Control Bd. v. Jones*, 112 S.W.2d 227, 229 (Tex. App.—Texarkana 1937, no writ) ("[t]he cancellation of a permit to sell liquor under the Liquor Control Act and the principle of law governing such matters is not a civil suit or cause of action[]" but is instead in the nature of a "special summary proceeding" for which no right to jury trial attaches); *Hammond v. Ashe*, 131 S.W. 539 (Tex. 1910) (recognizing that contested elections are proceedings "specially created and controlled by the statutes which allow them" and are not "causes" for which Article V secures a jury-trial right); *Pittman v. Byars*, 51 Tex. Civ. App. 83, 86, 112 S.W. 102, 106 (1908, no writ) (acknowledging the Texas Supreme Court's recent broad interpretation of the Judiciary Article language yet following "the beaten path of common law as well as the uniform practice by our own courts" in denying a jury-trial right, as a habeas proceeding involving child custody issues has historically been a "special proceeding of

---

[7] The Court in *Credit Bureau* also recognized that many of the earlier Texas cases finding no right to a jury trial in a particular proceeding mistakenly did so by failing to understand the unique nature of the Judiciary Article's jury-trial right and treating it the same as the Bill of Rights' jury-trial right. *See Credit Bureau*, 530 S.W.2d at 292 (recognizing that over the years, "some decisions have mistakenly treated the Bill of Rights and the Judiciary Article[] as identical in meaning, that is, as protecting the right of trial by jury only as it existed at common law or by statutes in effect at the time of the adoption of the Constitution" (citing *Hickman v. Smith*, 238 S.W.2d 838, 839 (Tex. App.—Austin 1951, writ ref'd)). In addition, other cases simply overlooked the Judiciary Article altogether and only considered a jury-trial right by virtue of the Bill of Rights. *See*, *e.g.*, *White v. White*, 581, 196 S.W. 508, 512 (Tex. 1917) (considering only the Bill of Rights in determining whether there was a jury-trial right in a "lunacy proceeding"); *Ex parte Garner*, 246 S.W. 371, 372 (Tex. 1922) (considering only the Bill of Rights in determining whether there was a jury-trial right in a writ of habeas corpus alleging unlawful restraint); *Ex parte Allison*, 90 S.W. 870 (Tex. 1906) (determining that no jury-trial right exists in a civil contempt proceeding under the 1876 Constitution's Bill of Rights without considering the Judiciary Article); *Davis v. State*, 35 Tex. 118 (1871) (finding no jury-trial right exists in a suit for the removal of a sheriff under the 1869 Constitution's Bill of Rights).

a summary character"); *Garcia*, 893 S.W.2d at 527 (finding that the Judiciary Article does not apply to a suit seeking judicial review of an administrative decision under the Workers' Compensation Act, as an administrative appeal is not a "cause" implicating a constitutional right to a trial by jury).

Moreover, we agree with Justice Busby that it would be wholly improper for a court to decide that a jury trial was "unsuitable" in a particular proceeding due to "special circumstances" if the proceeding were a cause within the meaning of the Judiciary Article. *Matter of Troy S. Poe Tr.*, 646 S.W.3d at 782 (Busby, J. concurring) ("[o]ur Constitution is clear that a jury trial is a matter of right—not of suitability . . . ."). Just as the legislature is prohibited from taking away an individual's constitutional right to a jury trial because of its belief that a jury trial is not suitable in a particular proceeding, we believe that a court is similarly prohibited from doing so. *See id.* at 784 (recognizing that the legislature cannot abrogate the constitutional right to a jury trial by statute) (citing *White v. White*, 581, 196 S.W. 508, 515 (Tex. 1917)). Accordingly, if a proceeding constitutes a Judiciary Article cause, then the jury-trial right may not be abrogated regardless of a particular court's view that a jury trial might not be suitable in that proceeding.

## B. Distinguishing causes from special proceedings

In determining what constitutes a Judiciary Article cause versus a special proceeding, we find additional guidance in legal sources existing during the general time period when the 1876 Constitution was drafted. *See Jaster*, 438 S.W.3d at 563. Although Bouvier's 1914 Law Dictionary in one sense broadly defined the term "cause" to include virtually any case in which there were "contested [questions] before a court of justice," it also treated the term "cause" as meaning a "cause of action" that "arises upon the breach of a duty or the violation of a right recognized in the law." Whitney R. Harris, *Jury Trial in Civil Cases—A Problem in Constitutional Interpretation*,

16

7 Sw. L.J. at 17 n.62 (1953) (citing Bouvier's Law Dictionary (8th ed. 1914)). As Bock points out, another leading treatise at the time described a cause of action (or judicial action) in 1876 to contain the following elements: "a primary right possessed by the plaintiff, and a corresponding primary duty devolving upon the defendant; a delict or wrong done by the defendant which consisted in a breach of such primary right and duty; a remedial right in favor of the plaintiff, and a remedial duty resting on the defendant springing from his delict, and finally the remedy or relief itself." JOHN NORTON POMEROY, REMEDIES AND REMEDIAL RIGHTS BY THE CIVIL ACTION 487 (Little, Brown and Company, eds., 1876). And the Texas Supreme Court later endorsed that definition in discussing jurisdictional issues when it stated: "Every cause of action, it is said by Mr. Pomeroy, consists, when subjected to analysis, of two separate and distinct elements,—the primary right and duty of the parties respectively, and the wrongful act or [omission] violating it." *Western Wool Comm'n Co. v. Hart*, 20 S.W. 131, 132 (Tex. 1892); *see also Phoenix Lumber Co. v. Houston Water Co.*, 61 S.W. 707, 708 (Tex. 1901) ("In the abstract, a cause of action consists of the 'right, claim, or the wrong suffered by the plaintiff, and of the duty or delict of the defendant.'"). And finally, one of the prevailing federal legal encyclopedias of the era recognized a clear distinction between actions and special proceedings. *See* 24 CYCLOPEDIA OF LAW & PROC. 128 (1907)[8] (generally applying the "right to trial by jury [unless extended by statute] . . . to actions according to the course of the common law and not to special proceedings of a summary character"). Professor Harris later described the proceeding in which a plaintiff sues a defendant seeking a personal judgment against the defendant as the "ordinary cause of action," which he contrasted with "special civil proceedings" that do not share this key attribute. Whitney R. Harris, *Jury Trial*

---

[8] #142 - Cyclopedia of Law and Procedure . . . v.24. - Full View | HathiTrust Digital Library.

*in Civil Cases—A Problem in Constitutional Interpretation*, 7 Sw. L.J. at 17 (1953). And he further observed that the various proceedings in which Texas courts have denied the jury-trial right appear to all fall within the special proceedings category. *Id.*

### C. The ordinary cause of action: a plaintiff suing a defendant

This interpretation of the term cause as meaning the ordinary cause of action in which a plaintiff seeks recourse against a defendant further comports with the Judiciary Article's "plaintiff" and "defendant" terminology. TEX. CONST. art. V, § 10. During the era in which the 1876 Constitution was adopted, Bouvier's Law Dictionary defined a plaintiff as a person "who, in a personal action, seeks a remedy for an injury to his rights." *Plaintiff*, BOUVIER'S LAW DICTIONARY (6th ed. 1856). It defined the term "defendant" in the opposing stance as a "party who is sued in a personal action." *Defendant*, BOUVIER'S LAW DICTIONARY (6th ed. 1856). And in turn, it defined a "personal action" as one "brought for the specific goods and chattels; or for damages or other redress for breach of contract or for injuries of every other description; the specific recovery of lands, tenements and hereditaments only excepted." [9] *Personal action*, BOUVIER'S LAW DICTIONARY (6th ed. 1856). In other words, a personal action encompasses a situation in which a party seeks a judgment against a defendant as a remedy for a violation of a personal right.

In modern times, the definition of the term "plaintiff" is not much different. The Texas Supreme Court recently recognized that dictionary definitions consistently define "plaintiff" in a broad manner as a party or person who brings a "civil suit" or "legal action." *See Jaster*, 438 S.W.3d at 563. A plaintiff must have a valid "cause of action" to file suit, which "involves the

---

[9] Bock cites several earlier dictionaries defining a "personal action" as one in which "one man brings against another, on any contract for money or goods, or on account of any offence or trespass; and it claims a debt, goods, chattels, &c. or damages for the same" [and] defendant is "[t]he party that is sued" in the action. *Personal action*, THE LAW DICTIONARY, EXPLAINING THE RISE, PROGRESS, AND PRESENT STATE OF THE ENGLISH LAW; DEFINING AND INTERPRETING THE TERMS OR WORDS OF ART (1st Am. ed. 1810).

combination of a right on the part of the plaintiff and a violation of such right by the defendant."
*Id.* at 564 (citing *Bell v. Moores*, 832 S.W.2d 749, 752 (Tex. App.—Houston [14th Dist.] 1992, writ denied)). And as our sister court recently recognized, the term cause as used in the Judiciary Article contemplates the existence of a plaintiff who is seeking justice against a defendant who has committed some wrongdoing as opposed to a special proceeding. *See Kruse v. Henderson Texas Bancshares, Inc.*, 586 S.W.3d 118, 124 (Tex. App.—Tyler 2019, no pet.) (finding that an action by a group of minority shareholders to determine the value of their shares was not a Judiciary Article cause, as there was no plaintiff seeking justice against a defendant; instead, it was a cause "specially created and controlled by the statutes that allow them" for which no jury-trial right existed); *see also Hammond*, 131 S.W. at 539 (categorizing a contested-election case as a special proceeding for which no jury-trial right exists); *Roper v. Jolliffe*, 493 S.W.3d 624, 634–35 (Tex. App.—Dallas 2015, pet. denied) (holding that a protective order proceeding was not a Judiciary Article cause, as the protective order statute purpose is "not to remedy past wrongs" but to protect against future violence and is therefore not an ordinary cause by which a party seeks to obtain his demand or pursue his right but rather a "proceeding[] specially created and controlled by the statutes which allow them").

### D. Reconciling the *Credit Bureau* cases

Finally, we note that this "test" for distinguishing between an ordinary cause of action and a special proceeding reconciles the various cases listed in *Poe* in which the Court determined that a jury-trial right does not exist. Significantly, the proceedings identified, which included "civil contempt proceedings, election contests, habeas corpus proceedings for custody of minor children, suits for the removal of a sheriff, and appeals in administrative proceedings," all lack the attributes of the "ordinary cause of action" in which a plaintiff sues a defendant seeking a personal judgment

19

against the defendant. *Matter of Troy S. Poe Tr.*, 646 S.W.3d at 779. Accordingly, we find the ordinary-cause-of-action framework to be the correct framework or test by which to determine whether a proceeding can be considered a Judicial Article cause versus a special proceeding that falls outside its scope.

## A TRUST-MODIFICATION PROCEEDING IS NOT A CAUSE

Utilizing the ordinary-cause-of-action framework, we agree with Bock that a trust-modification proceeding does not have any of the attributes of a cause for which a Judicial Article jury-trial right exists; instead, its nature is that of a special proceeding for which no jury-trial right exists. As Bock points out, in a trust-modification proceeding, there is no plaintiff seeking a right of recovery or a judgment against a defendant who has committed some wrong.

The Trust Code provides that a trustee or beneficiary may bring a "petition" for modification of a trust, but the petition is not filed against another party for the purpose of receiving a personal judgment. TEX. PROP. CODE ANN. § 112.054(a). Bock did not file a petition against Richard or seek any judgment against him; Bock made no claim that Richard breached any duty to him or engaged in any wrongdoing for which Bock was seeking recourse.[10] Instead, Richard was named as a respondent because all trustees, beneficiaries, and other interested parties must be named as respondents in a trust-modification proceeding. *See* TEX. PROP. CODE ANN. § 115.011(b)(1)-(4) (providing that in a proceeding involving a trust, all trust beneficiaries, trustees and parties receiving distributions from the trust estate must be joined as necessary parties).

---

[10] We contrast this with Richard's suit against Bock for breach of fiduciary duty, which has been severed from Bock's modification proceeding. In that case, Richard is a traditional plaintiff seeking a personal judgment against Bock as a defendant based on the defendant's alleged wrongdoing, in the nature of an "ordinary cause of action."

20

Richard acknowledges that in a trust-modification proceeding the parties do not bear the names "plaintiff" and "defendant" and are instead referred to as "petitioner" and "respondent." However, he contends that—to the extent the parties must be characterized as plaintiffs and defendants to be entitled to a jury trial—the terms have virtually the same meaning as "petitioners and respondents."[11] And according to Richard, he and Bock should be treated the same as a plaintiff and defendant because they stand in opposition to each other in the trust-modification proceeding, each seeking different results, thereby bringing the proceeding within the definition of a cause even under a narrower view of the term. Richard's argument is problematic for multiple reasons.

First, while we agree that labels placed on the parties may not always be dispositive of whether a jury-trial right exists in a particular proceeding, the parties must still be in a traditional plaintiff-defendant relationship for the proceeding to be considered an ordinary cause of action to which a jury-trial right attaches. As explained above, both historical and modern definitions of "plaintiff" and "defendant" define those terms in relation to each other in a court proceeding. *Jaster*, 438 S.W.3d at 563–64. (a plaintiff is a person who sues another party seeking a remedy in a personal action, while the defendant is the party who is being sued in such an action). That parties may be in an adversarial posture in a particular proceeding is not enough to render the proceeding a Judiciary Article cause. *See Matter of Troy S. Poe Tr.*, 646 S.W.3d at 779.

---

[11] Richard cites Black's Law Dictionary for the proposition that a "plaintiff" and a "petitioner" have identical meanings, pointing out that Black's defines a "plaintiff" as "[t]he party who brings a civil suit in a court of law" while it defines a "petitioner" as the "party who presents a petition to a court." BLACK'S LAW DICTIONARY (11th ed. 2019). However, these broad definitions do nothing more than suggest that both a plaintiff and a petitioner have the right to file documents in court; they do not provide insight into substantive differences in the filings.

Second, as Bock points out, there is historical support in treating a trust-modification proceeding as a special proceeding. Courts have generally treated issues involving the administration of trusts—and deviation proceedings in particular—as matters for the court, rather than a jury, to resolve. *See Texas State Bank v. Amaro*, 87 S.W.3d 538, 545 (Tex. 2002) (holding that in routine matters involving trust administration, such as the approval of trust accountings, there is no jury-trial right).[12] Even prior to the codification of trust-modification proceedings, equitable trust-deviation proceedings were historically considered to be within a court's "general power over the administration of [a] trust." *See Amalgamated Transit Union, Local Div. 1338 v. Dallas Pub. Transit Bd.*, 430 S.W.2d 107, 117 (Tex. App.—Dallas 1968, writ ref'd n.r.e.) (citing Restatement of Law of Trusts, 2d Edition, Sec. 167, p. 351); *see also* GEORGE TAYLOR BOGERT, THE LAW ON TRUSTS AND TRUSTEES, Ch. 27, Sec. 561 (Rev. 2d ed. 1977) ("jurisdiction of equity to enforce trusts should and does include power to vary the details of administration which the settlor has prescribed in order to secure the more important result, namely, obtaining for the beneficiaries the advantage which the settlor stated he wished them to have"). Thus, by analogy to receivership cases, Bock posits, and we agree, that the power to modify a trust is ancillary to a court's authority to administer the trust and must therefore be considered a special proceeding for which there is no jury-trial right. *See, e.g.*, *Cocke v. Southland Life Ins. Co.*, 75 S.W.2d 194, 198 (Tex. App.—El Paso 1934, writ ref'd) (recognizing there is no jury-trial right for "incidental" or "supplemental" proceedings in a receivership matter); *McHenry v. Bankers' Tr. Co.*, 206 S.W. 560, 572 (Tex. App.—Galveston 1918), *writ dismissed sub nom. McHenry v. Bankers' Tr. Co.*,

---

[12] The court in *Amaro*, however, noted that there is a jury-trial right in related tort cases, such as when a trustee or beneficiary brings a claim for breach of fiduciary duty or other related claims against someone. *Texas State Bank v. Amaro*, 87 S.W.3d 538, 545 (Tex. 2002). As set forth above, the trial court in the present case granted Richard's request for a jury trial on his breach-of-trust claim.

22

255 U.S. 559 (1921) (per curiam) (recognizing that intervenors in a receivership proceeding had no right to a jury trial on an ancillary issue involving their water rights in the case).

Finally, Bock provided us a lengthy list of reported cases in which trial judges were responsible for handling trust-modification or deviation proceedings. *See, e.g.*, *Amalgamated Transit Union*, 430 S.W.2d at 112–13 (recognizing trial court's authority to modify a trust); *Di Portanova v. Monroe*, 402 S.W.3d 711, 714 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (trial court modified eight trusts following a bench trial). And Richard can only point to one reported case in which a trust-modification proceeding was heard by a jury, and in that instance, it appears that the interested parties agreed to a jury trial and no party raised the jury-trial issue on appeal.[13] *See Coffee v. William Marsh Rice Univ.*, 408 S.W.2d 269, 285 (Tex. App.—Houston 1966, writ ref'd n.r.e.).

Accordingly, we conclude that a trust-modification proceeding cannot be considered a Judiciary Article cause for which a jury-trial right exists and is instead a special proceeding that falls outside the scope of that grant.

Richard's first issue is overruled.

## THE TRUST MODIFICATION

We now turn to Richard's second issue on appeal: whether the trial court abused its discretion by modifying the Trust terms and relying on extrinsic evidence in doing so. We conclude that the trial court did not abuse its discretion in either regard.

---

[13] In the Rice University case, the trustees disagreed over whether the trust that created the University should be modified to allow minority students to attend the University. *See Coffee v. William Marsh Rice Univ.*, 408 S.W.2d 269, 271 (Tex. App.—Houston 1966, writ ref'd n.r.e.). In a briefing appendix, Bock provided a copy of a purported letter documenting that University trustees seeking the trust modification were advised to agree to the opposing trustees' request for a jury trial as a strategic move to avoid a jury-trial right issue on appeal.

23

## A. Evidence presented at the hearing

At the hearing, Bock introduced copies of the Trust and the Care Agreement, and he testified, along with several other witnesses, including Troy's caregiver, Angel Reyes; Reyes's wife, Carrie, who assisted Reyes with Troy's care; Troy's cousin, Kellie Monticelli, who spent substantial time with Troy and cared for Troy when Reyes was unavailable; and Scott Mann, an attorney and close friend to Troy, who also spent substantial time socializing with Troy.

Those who testified on the subject all agreed that Dick routinely paid many expenses for Troy's social life that exceeded the monthly cap in the Care Agreement—both from Dick's personal funds and the Trust funds. The expenditures allowed Troy to travel, attend sporting events, and have large gatherings of families and friends at the home he shared with the Reyes family, all to ensure that Troy had a happy and healthy life and a lifestyle commensurate with his father's wealth. The witnesses testified that Dick had expressed his belief that ensuring Troy led this active lifestyle not only enhanced Troy's quality of life but allowed him to live past his projected life expectancy given his illness. Bock also testified to his discussions with Dick wherein Dick was emphatic about not wanting a corporate trustee other than as a last resort. Instead, according to Bock, "[h]e wanted family members or people that knew trusts, knew Troy and his situation to be involved."[14]

The record reflects that following Dick's death, Richard and Bock disagreed over whether to approve several of Reyes's reimbursement requests, many of which Bock testified were routine

---

[14] Bock testified that not long before he died, Dick replaced Richard with Bock in his will as a co-executor of his estate. Bock makes this statement to highlight Dick's trust in him. Moreover, with regard to the Trust, Bock highlights his "good working relationship" with Reyes and his family in contrast to Richard's lack of a "meaningful, personal relationship with [Troy] or the Reyes family."

24

expenses Dick had previously approved without question.[15] According to Bock, Reyes, and Carrie, the disagreements resulted in substantial reimbursement delays, which financially strained Reyes and his family. And because he was uncertain whether he would receive reimbursement for Troy's expenses, Reyes curtailed Troy's social activities, limiting Troy's travel and attendance at sporting events. The witnesses further testified that Troy was aware of the change in his lifestyle and his inability to engage in the activities to which he had become accustomed, which was having a negative impact on him. Among other things, they observed that Troy appeared "sad," "stressed," and "nervous," and Reyes observed that Troy has been acting out and having fits to the point of making himself sick. Richard did not present any evidence at the hearing, but his attorneys did cross-examine the witnesses.

Following the hearing, the trial court entered findings of fact and conclusions of law in which it found that a modification was warranted, stating that "[b]ecause of changed circumstances since the death of [Dick], the purposes of the Trust have become impossible to fulfill, and modification will further the Trust purposes." The trial court then made two broad categories of modifications to the Trust, as requested by Bock: (1) it elaborated on what type of expenditures the trustees were authorized to make; and (2) it appointed a third trustee, lifted the unanimity provision, required three trustees at all times, and provided a method for appointing successor trustees. Richard contends that the trial court erred in modifying the Trust in both respects. We disagree.

---

[15] In addition, Bock testified that Richard had refused to approve his request to give Reyes his annual Christmas bonus as Dick had done for at least the past three years.

25

## B. Standard of review and applicable law

Section 112.054(a) of the Trust Code which codified the common law trust "deviation" doctrine, provides that upon petition of a trustee or a beneficiary, a

> court may order that the trustee be changed, that the terms of the trust be modified, that the trustee be directed or permitted to do acts that are not authorized or that are forbidden by the terms of the trust, that the trustee be prohibited from performing acts required by the terms of the trust, or that the trust be terminated in whole or in part

under certain specified circumstances. TEX. PROP. CODE ANN. § 112.054(a). The two relevant circumstances in which such modifications are permitted here are: (1) "the purposes of the trust have . . . become . . . impossible to fulfill"; and (2) "because of circumstances not known to or anticipated by the settlor, the order will further the purposes of the trust[.]" *Id.* § 112.054(a)(1), (2). The second ground for modification, which was added by a 2005 amendment, "liberalized" the standard for trust modification by authorizing modifications "that enhance the attainment of the settlor's trust purposes." *In re Willa Peters Hubberd Testamentary Trust*, 432 S.W.3d 358, 365 (Tex. App.—San Antonio 2014, no pet.) (citing *In re White Intervivos Trusts*, 248 S.W.3d 340, 342 (Tex. App.—San Antonio 2007, no pet.)). The second ground permits a court "to modify the terms of a trust if, due to circumstances not known to or anticipated by the settlor, compliance with the terms of the trust would defeat or substantially impair accomplishment of the purposes of the trust." *Conte v. Ditta*, 312 S.W.3d 951, 959 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

The Code gives the trial court discretion to order a modification under these circumstances in a "manner that conforms as nearly as possible to the probable intention of the settlor." TEX. PROP. CODE ANN. § 112.054(b) (a "court shall exercise its discretion to order a modification . . . under Subsection (a) . . . in the manner that conforms as nearly as possible to the probable intention of the settlor"). Thus, a trial court "does not have unfettered discretion to modify the

26

Trust in any way it chooses." *See Conte*, 312 S.W.3d at 959 (citing TEX. PROP. CODE ANN. § 112.054(b)). Using this guidance, we apply an abuse-of-discretion standard in reviewing the trial court's modification order. *See In re Willa*, 432 S.W.3d at 365 (applying the abuse-of-discretion standard to a trust modification under § 112.054(a)); *Conte*, 312 S.W.3d at 959 (same).

A trial court abuses its discretion when it "renders an arbitrary and unreasonable decision lacking support in the facts or circumstances of the case" or "acts in an arbitrary or unreasonable manner without reference to guiding rules or principles." *El Paso Sw. Cardiovascular Associates, P.A. v. Crane*, 649 S.W.3d 430, 435 (Tex. App.—El Paso 2021, no pet.) (citing *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011)). An abuse of discretion does not occur when the trial court bases its decisions on conflicting evidence. *Sanders Oil & Gas, Ltd. v. Big Lake Kay Constr., Inc.*, 554 S.W.3d 79, 97 (Tex. App.—El Paso 2018, no pet.) (citing *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998)). However, "[a] trial court has no discretion in determining what the law is or in applying the law to the facts." *Id.* (citing *In re Paso Del Norte Surgery Ctr.*, 281 S.W.3d 521, 524 (Tex. App.—El Paso 2008, no pet.)). "Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Id.*

## C. Relying on extrinsic evidence

Before determining whether the trial court abused its discretion in modifying the Trust, we consider Richard's argument regarding whether the trial court was permitted to consider extrinsic evidence in making its determination. Richard appears to agree that the trial court could rely on extrinsic evidence to determine whether the modification predicates existed, i.e., whether the purposes of the Trust had become impossible to fulfill and whether, because of changed circumstances not known or anticipated by Dick, a modification would further the purposes of the Trust. *See Swantner-Carter v. Frost Nat'l Bank*, No. 13-06-00545-CV, 2008 WL 3521253, at *5

27

(Tex. App.—Corpus Christi Aug. 7, 2008, no pet.) (mem. op.) (recognizing that the trial court could rely on extrinsic evidence in considering whether there were any changed circumstances not anticipated by the settlor that would warrant trust modification or termination under § 112.054 or whether the trust purposes were still being fulfilled). However, Richard contends the trial court was not permitted to rely on extrinsic evidence in determining the *manner* in which to modify the Trust—at least to the extent the evidence contradicted or varied the express and unambiguous terms of the Trust itself.

Richard relies on cases holding that, in construing trust terms, a trial court is generally confined to ascertaining the meaning of the terms and the settlor's intent by reviewing the four corners of the document itself without resorting to extrinsic evidence. *See generally In re Ray Ellison Grandchildren Trust*, 261 S.W.3d 111, 117 (Tex. App.—San Antonio 2008, pet. denied) (when construing a trust document and seeking to ascertain its purposes, the court should be guided by the document itself). While courts may not use extrinsic evidence to determine "the construction of a written instrument," such as a trust, the rule does not apply when the court is considering "the right to reformation, rescission or other equitable relief." *See Cutrer v. Cutrer*, 345 S.W.2d 513, 519 (Tex. 1961); *see also Odom v. Coleman*, 615 S.W.3d 613, 623–25 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *In re Ignacio G. & Myra A. Gonzales Revocable Living Tr.*, 580 S.W.3d 322, 327–29 (Tex. App.—Texarkana 2019, pet. denied) (explaining that different legal principles apply to modification cases as opposed to construction cases)). As Bock points out, when a trustee or beneficiary seeks to modify trust terms under § 112.054 due to changed circumstances, by the very nature of the proceeding, the court must consider evidence to not only establish whether changed circumstances exist but what modifications would most clearly conform with the settlor's "probable intention" and further the purposes of the trust. *See* TEX. PROP. CODE

ANN. § 112.054(b) (requiring the court to consider the settlor's "probable intentions" in modifying or terminating a trust); *see also Coffee*, 408 S.W.2d at 283–84 (permitting the use of extrinsic evidence in a trust-deviation proceeding when determining whether proposed modification comported with the settlor's purpose in creating the trust).

Richard cites *Conte v. Ditta* to support his argument that the trial court was not entitled to rely on extrinsic evidence when considering how to modify a trust. 312 S.W.3d 951. But *Conte* did not actually address that issue. In *Conte*, which was also a § 112.054 trust-modification proceeding, the trial court removed a trustee for wrongdoing and then appointed a successor trustee in a manner different from the trust's specified method for appointing successor trustees. *Id.* at 958. The court of appeals held that the trial court abused its discretion in modifying the trust, not because the trial court relied on extrinsic evidence in doing so, but because the modification did not conform "as nearly as possible to the intention of the settlor" as required by the Trust Code. *Id.* at 960–61. Accordingly, Richard has not convinced us that the trial court erred in considering extrinsic evidence to determine how to modify the trust.

### D. Modifying distribution provisions

In analyzing whether the trial court abused its discretion, we start with the modifications to the Trust's distribution provisions. The Trust provided that the trustees were to "hold, manage, invest, and reinvest the trust estate," "collect the income therefrom," and "pay the net income to Troy S. Poe" or apply it for Troy's benefit, in at least quarterly installments. The Trust authorized the trustees, in their absolute discretion, to use Trust principal, regardless of other resources available to Troy, for his "health, education, maintenance, or support." Additionally, the Trust authorized the trustees to make decisions regarding "discretionary payment or income" from the Trust for Troy's benefit.

29

The trial court added four new provisions to the Trust allowing the trustees to take into account several factors in making distributions: (1) authorizing payment of travel expenses for Troy and any needed assistants and travel companions; (2) making distributions that take into account the standard of living Troy enjoyed at the time of Dick's death; (3) recognizing that there will be an indirect benefit to Troy's caregivers and other family members in making distributions for Troy's benefit; and (4) giving primary consideration to Troy's needs without considering the interests of any vested or contingent remainder beneficiaries.

Richard contends these modifications contravened the Trust's clear intent, which was to provide solely for Troy's support, because the modifications allow using Trust assets to benefit third parties, including Troy's caregivers, which was not within Dick's expressed or "probable" intent. Richard argues the modifications also contravened the Care Agreement's express terms, which limited the amount of compensation for Reyes's services and the amount of monthly expenditures he could make on Troy's behalf. Richard therefore concludes that the trial court's modifications failed to "conform as nearly as possible to Dick's unambiguous intent concerning the permissible uses of Trust assets." We disagree.

The Trust's stated purpose was to benefit Troy and provide for his "health, education, maintenance [and] support," regardless of other resources available to him. And while the Trust itself did not elaborate on what Dick may have meant by providing for Troy's support, ample evidence in the record supports a finding that Dick's intent in the Trust and Care Agreement was to enable Troy to travel, have an active social life, and generally enjoy a standard of living that allowed him to prosper and enjoy life to the extent possible in light of his medical condition. In particular, under the Care Agreement, Troy was to live with the Reyes family (which included Angel Reyes, his wife, and their son) in the home Dick built for them, and Reyes was tasked with

30

maintaining the home and ensuring Troy enjoyed a "wholesome and healthy home environment." The Care Agreement also required Reyes to "provide any spiritual, physical, social or companionship needs of Troy . . . [and] social interaction and entertainment to the extent possible," to provide Troy with transportation "for such shopping and social activities as Troy is able to perform," and to generally furnish Troy with "goods" for his "use and enjoyment."

The record also contained ample and uncontradicted evidence that Dick was aware of the close, familial relationship Troy, Reyes, and Reyes's family shared and their routines of traveling together on vacations and attending sporting events together, in part because of Troy's need for physical assistance on such outings, but also because of Troy's desire to have the family and others accompany him as travel companions. The record further shows Dick freely paid the expenses Reyes and his family incurred in traveling with Troy and taking him to events when those expenses exceeded the monthly cap in the Care Agreement. In addition, the record contained evidence that Dick made gifts to Reyes and his family over the years, including giving Reyes and his family an annual Christmas bonus in recognition of Dick's gratitude for the services and emotional support they provided to his son. In other words, the record clearly supports a finding that Dick was fully aware that those who socialized with and traveled with Troy were receiving both a direct and indirect benefit from the various expenditures, and approved of such as it furthered Dick's goal of providing Troy with the best life possible given his limitations.

The record also supports a finding that upon Dick's death, Richard and Bock were embroiled in disputes regarding if and when to approve Reyes's reimbursement requests and whether to approve Trust disbursements to ensure Troy maintained the same standard of living he had prior to his father's death. And the record reflects that their disputes were interfering with the Trust administration, which in turn was having a negative impact on Troy's well-being.

31

Accordingly, the trial court could have reasonably found that, given these changed circumstances, modifying the Trust to specify the type of expenditures the trustees were authorized to make on Troy's behalf would enhance the Trust's ability to fulfill Dick's intention of ensuring his son's continued well-being. *See In re Willa*, 432 S.W.3d at 365 (recognizing that a trial court may modify a trust in light of changed circumstances to "enhance the attainment" of the trust purposes). Therefore, we conclude that the trial court properly exercised its discretion under the Trust Code in determining that Dick's "probable intention" would have been to allow these modifications in response to the changed circumstances after his death.

### E. Modifying decision-making and trustee-related provisions

We next consider whether the trial court abused its discretion in modifying the decision-making and trustee provisions. The Trust named Dick, Richard, and Bock as trustees and provided that they were to make decisions "jointly." The Trust then provided:

> If any of the Trustees for any reason shall fail or cease to act as Trustee, the remaining Trustees or Trustee shall have the right to serve as sole Trustee hereunder, without appointment of a successor co-Trustee. If the last remaining individual Trustee for any reason shall fail or cease to act, then Grantor hereby appoints BANK OF THE WEST, El Paso, Texas (or its successor entity) as sole Trustee.

In the event the last remaining trustee resigned, his resignation would not become effective until the Grantor appointed a successor trustee, but if the Grantor were to be unable to do so, his resignation would not become effective until a "court of competent jurisdiction" appointed a successor trustee.

The trial court modified those provisions as follows:

> **Initial and Successor Trustees**. ANTHONY E. BOCK, RICHARD C. POE II, and KELLIE MONTICELLI shall serve as Co-Trustees. If any of the Initial Trustees is unable or unwilling to continue serving as Trustee, SCOTT MANN shall serve in his or her place. At any time there are fewer than three individual Trustees,

32

ANTHONY E. BOCK or STEVE BELTRAN, in that order, shall have the power to name another individual Trustee such that there are always three individual Trustees.

The trial court also eliminated the requirement that the trustees were to act "jointly," providing instead that the trustees could make decisions by "majority vote."

In its findings of fact, the trial court justified these modifications by pointing out that since Dick's death, Richard and Bock could not reach "unanimity" on Trust administration decisions, and that without unanimity, the Trust could not function. It further concluded that the appointment of a successor trustee who was familiar with Troy and sensitive to his needs would further the purposes of the Trust, as would allowing Bock and Beltran to name any successor trustees.

Richard, however, contends these modifications clearly contravened Dick's intent as expressed in the Trust, which was to require unanimity in making Trust decisions; to not appoint a successor trustee as long as at least one of the original trustees remained; and to appoint Bank of the West as the trustee in the event that no other trustees remained. Richard further argues that even if it was appropriate to appoint a third trustee, the trial court abused its discretion by appointing Kellie pursuant to Bock's request and against Richard's wishes because Dick clearly stated in the Trust that Richard was to have an equal vote in Trust decisions. Richard also highlights Bock's testimony that he suggested to Dick during his final illness that Dick might wish to modify the Trust to name a "tiebreaker" trustee to serve upon his death, given the potential that Richard and Bock might disagree over Trust matters, but Dick declined to do so. And finally, Richard argues the trial court's modifications effectively excluded him from the Trust's administration, which he believes contravened Dick's intent in appointing him as a trustee and providing him with equal voting rights. We find none of these arguments availing.

First, Dick's reasons for declining to amend the Trust did not necessarily reflect that he was opposed to the idea of appointing a "tiebreaker" trustee. Bock testified that after he proposed the idea to Dick, the two of them met with the attorney who drafted the Trust to discuss the possibility of such an amendment, but Dick decided against it when he learned Richard would be required to sign the amendment, as "[Dick] didn't want to ask Richard to participate in that change." Therefore, we do not find that Dick's failure to amend the Trust reflected his "probable intention" to have Richard and Bock to remain the sole trustees had he been aware of the problems that arose between the two after his death. Instead, we rely on the trial court's evaluation of the evidence indicating the opposite. And as to Richard's position that the modifications effectively excluded him from the Trust's administration, his argument presupposes that he will never agree with another co-trustee. We decline to engage in any such presumption or speculation.

Second, there was ample evidence to support the trial court's modification of both the decision-making and the trustee provisions as permitted by the Trust Code. The Trust Code permits a trial court to order that a "trustee be changed" and to modify other related trust terms to further the trust purposes upon a finding of changed circumstances. TEX. PROP. CODE ANN. § 112.054(a). Here, the trial court's modifications naming Troy's cousin Kellie as a third trustee and lifting the unanimity requirement varied the Trust's express terms that would have permitted Bock and Richard to continue as the sole trustees after Dick's death and required them to reach decisions jointly. Given the evidence of gridlock and delays, however, the trial court could have reasonably found that the unanimity provision was interfering with and would continue to interfere with the ability to accomplish the Trust's purposes. Based on the evidence, the trial court could have reasonably concluded that appointing a third trustee who was aware of and sensitive to Troy's needs was an appropriate way to modify the Trust to allow it to continue serving its purpose in

34

accordance with Dick's probable intent. *See generally In re Estate of Bryant*, No. 07-18-00429-CV, 2020 WL 1174586, at \*10 (Tex. App.—Amarillo 2020, no pet.) (mem. op.) (finding that the "caustic relationship" between the two trustees of a family trust warranted a modification to the trust, which included the removal of one of them, as the trust was otherwise operating in "an atmosphere of acrimony and mutual distrust").

The trial court was free to modify the Trust in a way that deviated from the Trust language naming the bank because it could have reasonably concluded that appointing Kellie most closely comported with Dick's probable intent given the changed circumstances that impeded the Trust's purposes. First, Bock testified that during the Trust formation, Dick informed him that he only wanted a corporate trustee as a "last resort." Instead, Dick wanted "family members or people that knew trusts, knew Troy and [knew] his situation to be involved." Dick's selection of a family member and Dick's long-time accountant who had been involved in the formation of the Trust itself and also knew Troy and his situation at the time the Trust was formed supported this intent. Second, the evidence demonstrated Kellie has a close and loving relationship with Troy, she visits him often, and Troy trusts her with taking care of his needs when Reyes and his family are unavailable. To the contrary, the bank had very little, if any, involvement in the Trust.

We similarly find that the trial court acted reasonably in naming attorney Scott Mann, who the evidence showed had a close relationship with Troy,[16] as a third trustee if one of the current

---

[16] Scott Mann testified that he met Troy through Reyes approximately ten years ago and that Mann, his wife, and their children (who refer to Troy as "Uncle Troy") see Troy socially three to four times per month. Mann further testified that over the years, he has come to understand Troy's communications. Mann testified that he was willing to serve as a successor trustee and would not have any difficulty in scrutinizing receipts to ensure expenditures were made for Troy's benefit. Mann confirmed he would not seek payment if he were to serve as a trustee, nothing would prevent him from working with Richard as a fellow trustee, and neither he nor his law firm were adverse to Richard in any business or litigation matters. Mann also testified there was no reason he could not work cooperatively with Bock as a co-trustee.

trustees was unable or unwilling to serve, and in giving Bock or Steve Beltran (who also had a close relationship with Troy),[17] in that order, the "power to name another individual Trustee such that there would always be three individual Trustees."[18] When one of the trustees is no longer able or willing to serve, having a mechanism whereby individuals close to Troy and familiar with his needs appoint a third trustee ensures that the Trust purposes will be effected, thus this modification "enhance[s] the attainment of the settlor's trust purposes." *See In re Willa*, 432 S.W.3d at 365 (citing *In re White Intervivos Trusts*, 248 S.W.3d at 342 (speaking to the 2005 amendment liberalizing the standard for trust modifications)).

Under the abuse-of-discretion standard, we must uphold the trial court's decision if it acted with reference to guiding principles in making modifications conforming "as nearly as possible to the probable intention of the settlor" based on the evidence before it. Whether the evidence was conflicting or not, we rely on the trial court's assessment thereof to determine Dick's probable intent and make modifications to effectuate the Trust's purposes even if those modifications are different from the Trust's express terms. *See* TEX. PROP. CODE ANN. § 112.054(b) (trustees may be changed when "(1) the purposes of the trust have been fulfilled or have become illegal or impossible to fulfill; [or] (2) because of circumstances not known to or anticipated by the settlor, the order will further the purposes of the trust"); *see also Conte*, 312 S.W.3d at 959 (citing TEX. PROP. CODE ANN. § 112.054(b) (speaking to the court's discretion to modify a trust as consistent as possible with the settlor's intent)); *El Paso Sw. Cardiovascular Associates, P.A. v. Crane*, 649 S.W.3d 430, 435 (Tex. App.—El Paso 2021, no pet.) (citing *Samlowski v. Wooten*, 332

---

[17] Reyes characterized Steve Beltran as Troy's "absolute best friend" who Troy trusts and sees every weekend. Beltran goes to Troy's house to socialize because it is accessible to Troy and his room is there if he gets tired.

[18] The provision requires a resigning trustee to apply to a court of competent jurisdiction for the appointment of a successor trustee in the event neither Bock nor Steve Beltran appoints a successor trustee in a resigning trustee's place.

S.W.3d 404, 410 (Tex. 2011) (regarding abuse-of-discretion standard)).

Because the modifications furthered the Trust's purposes and were premised upon evidence in the record regarding Dick's probable intent, we conclude that the trial court did not abuse its discretion in making these changes. Richard's second issue is overruled.

## CONCLUSION

Having found that there is no Judiciary Article jury-trial right in a § 112.054 trust-modification proceeding and that the trial court properly exercised its discretion, we affirm the trial court's judgment.

LISA J. SOTO, Justice

July 28, 2023

Before Rodriguez, C.J., Palafox, J. Soto, J.
Palafox, J. dissenting